UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JUMAR K. JONES,

                Plaintiff,

                                          Case No. 16-cv-1687-pp

    v.

KELLI WEST, *et al.*,

                Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 31) AND DISMISSING CASE

      The plaintiff, who is representing himself, filed this lawsuit under 42 U.S.C. §1983. The court allowed him to proceed on claims that the defendants violated his First Amendment free exercise rights when they prevented him from observing Ramadan. Dkt. No. 17. The defendants have filed a motion for summary judgment. Dkt. No. 31. The court will grant their motion and dismiss the case.

## I.   RELEVANT FACTS[1]

      The plaintiff, who has been a practicing Muslim since 1996, was an inmate at Green Bay Correctional Institution when the incidents alleged in his complaint occurred. Dkt. No. 33 at ¶¶1, 55. Defendant Kelli West is the Division of Adult Institution (DAI) religious practices coordinator; defendant Michelle Haese was the social services director at Green Bay and she

---

[1] Under Civil L.R. 56(b)(4), the court will deem undisputed those proposed facts to which a party does not respond.

supervised defendant Michael Donovan, the chaplain at Green Bay; defendant
Kelly Salinas is a corrections complaint examiner (CCE); defendant Alan
DeGroot is an institution complaint examiner (ICE) at Green Bay; and
defendant Scott Eckstein was the warden at Green Bay. Id. at ¶¶3-8.

The facts giving rise to the plaintiff's claims are largely undisputed. In
2016, Ramadan started on June 7 and ended on July 6 with the Eid al-Fitr
feast. Dkt. No. 33 at ¶56; see https://www.timeanddate.com/holidays/us.
During the month of Ramadan, Muslims fast during the daylight hours,
breaking their fast daily sometime after sundown and before sunrise. Dkt. No.
32 at 2.

Inmates incarcerated at DAI prisons may participate in the Ramadan
fast; they are given meal bags during non-fasting hours (meals to eat after
sundown and before sunrise) which contain a day's worth of food. Dkt. No. 33
at ¶¶9-11. Under DAI policy 309.61.03, inmates who want to receive bagged
meals during Ramadan must submit an interview/information request to the
chaplain at least sixty days before the first bagged meal. Id. at ¶¶12-13. There
are some exceptions to the sixty-day sign-up deadline. For example, if an
inmate transfers into the institution after the sixty-day deadline or during
Ramadan, that inmate may receive bagged meals upon confirmation that he
was receiving Ramadan meals at his prior institution or had signed up for
meals prior to Ramadan at his prior institution. Id. at ¶13. The institution
assumes that there will be few transferring inmates to accommodate under this
exception. Id. at ¶77. There is no "start date" for asking to be added to the list;
an inmate may ask as early as he wishes (presumably, an inmate could have
asked in May 2019 to be put on the bagged meal list for the 2020 celebration,
scheduled to start Friday, April 24, 2020). Id. at ¶14. At Green Bay, inmates

may place their request forms in the internal mailbox in their housing unit or in the chapel request box in the rotunda; they also may give their request forms directly to Donovan. Id. at ¶¶17-18. The sixty-day sign-up deadline for Ramadan and all other multi-day religious observances has been in effect since 2012. Id. at ¶19. The plaintiff timely asked to participate in Ramadan every year since the policy went into effect. Id. at ¶55.

The defendants explain that planning for Ramadan each year is "a considerable undertaking with many moving parts." Id. at ¶62. Planning for Ramadan starts about three months in advance. Id. at ¶63. The food services administrators at institutions throughout Wisconsin submit month-long Ramadan menus to the dietetic services director for approval. Id. at ¶64. There are different menus for general fare, Halal, plant-based and dairy-free Ramadan bags. Id. Other diets also may be needed if there are participants on low-sodium or low-fat diets or who require a peanut-free or soy-free diet. Id.

The dietetic services director considers the menus in light of product availability, ingredients, packaging, serving size and updates to nutrition standards. Id. at ¶65. If changes to a menu are required, there can be significant back and forth between the food service administrator and the dietetic services director. Id. at ¶68.

After the menus have been approved, the Department of Corrections tries to give the menus to its vendor up to eight weeks in advance of ordering the food. Id. at ¶69. It does this to allow the vendors an opportunity to acquire adequate stock. Id. If a vendor is unable to acquire adequate stock, further adjustments to the menu may need to be made. Id. Although the DOC can estimate quantities of food based on prior years' data, participation each year varies. Id. at ¶70. From 2011 through 2016, the number of DOC-wide

participants ranged from 764 to 933. Id. In the last five years, the number of participants at Green Bay ranged from 61 to 110. Id. at ¶71.

Once the menus have been set and the vendor is on notice, the institutions need to recalculate their purchasing and production number as precisely as possible for the various Ramadan bags. Id. at ¶72. Serving certain inmates with Ramadan bags results in changes being made to the quantities needed for non-Ramadan meals. Id. According to the defendants, the DOC's limited food budget does not allow institutions to maintain *extra* inventory. Id. at ¶73. But institutions cannot afford to run *short* on inventory because security problems may arise if the last inmates served receive different food items from those previously served. Id. Meeting those competing objectives is why the institutions strive to determine the precise quantities of food needed. Id.

It can take a vendor up to four weeks to fill an institution's order, depending on the order quantity and the availability of the products. Id. at ¶74. The institution must have the food two weeks prior to the start of Ramadan, so that it can thaw it in accordance with food service standards. Id. at ¶74. The institution then prepares the food three to four days before it is served. Id. at ¶75.

According to the defendants, there are generally no extra Ramadan meals available on any given day. Id. at ¶76. To accommodate an inmate not on the bagged-meal list, the kitchen staff would have to use food intended for other purposes or would have to purchase extra food to ensure food is on hand, but the food budget does not allow for such purchases. Id. As a result, staff do not add inmates to the Ramadan list after the sign-up deadline passes unless the

inmate satisfies one of the narrow exceptions stated in the policy (which are not relevant to the plaintiff's claims). Id. at ¶13, 77.

While the sign-up deadline has been in place at all institutions since 2012, prior to 2016, each institution was free to determine how to notify inmates of sign-up deadline. Id. at ¶21. According to the defendants, the DAI reviewed the varying institution practices for providing religious notices and identified several concerns with having different approaches at different institutions. Id. at ¶¶22-28. For example, an inmate who received notices a certain way at one institution might expect the same kind of notice upon transfer to another institution, despite differences in institution practices. Id. at ¶23. Some facilities were selectively publicizing only certain religious accommodations via television, perhaps giving rise to a perception of preference for some faiths over others. Id. at ¶28. Accordingly, in 2016, the DAI created a policy requiring prisons to post a DAI memo containing all the dates and deadlines for the upcoming year's temporary, multi-day religious fasting and dietary observations. Id. at ¶31. The policy required that the memo be posted in the chapel. Id. The policy allowed the prisons to post the memo elsewhere, but they were not required to post it any other place. Id. at ¶¶31, 36. According to the defendants, any notices that institutions posted in places other than the chapel were a courtesy to the inmates. Id. at ¶32.

Prior to 2016, Green Bay had posted reminders about the Ramadan sign-up deadline on institution television. Id. at ¶38. After surveying the practices of other maximum-security prisons, wanting to be fair to inmates who didn't have televisions, and considering the DAI's warning that *all* faith groups needed to receive the same notices, Green Bay decided to stop posting religious notices on institution television. Id. at ¶¶39-41. Haese and Eckstein made this decision

on the advice of West. Id. at ¶42. Donovan, DeGroot and Salinas were not involved in the decision. Id.

According to the defendants, the DAI deadlines memo for 2016 was released on December 2, 2015. Id. at ¶45. It listed the sign-up deadlines for Lent, Baha'I, Passover, Ramadan, Tisha B'Av and Yom Kippur. Id. at ¶46. At some point, no later than February 5, 2016 (about four months before Ramadan started), Green Bay posted the memo in the chapel, the library and on the restricted housing unit carts. Id. at ¶47. Islamic inmates were offered a weekly service and a weekly study group in the chapel, id. at ¶49, and were told of the 2016 Ramadan sign-up deadline during the group services, id. at ¶50. Inmates also could ask the chaplain or staff about the dates of religious observances, could ask each other or could ask family members. Id. at ¶¶51-52.

The plaintiff was aware that a sign-up deadline existed; he had signed up to receive bagged meals during Ramadan every year since the deadline had been put in place. Id. at ¶55; Dkt. No. 50 at ¶¶9-11. The plaintiff explains, however, that because the start of Ramadan changes every year according to the sighting of the new moon, he had relied on posted notices to determine the start of Ramadan, and by extension, the deadline by which he had to sign up to receive bagged meals.[2] Dkt. No. 50 at ¶¶6-8, 44. The plaintiff explains that prior to the 2016 policy taking effect, Green Bay had posted religious notices on institution television, which informed viewers who wished to participate in Ramadan to send a request to Donovan for bagged meals. Id. at ¶10. As previously noted, starting in 2016, religious notices were no longer played on

---

[2] The plaintiff's reliance on notices is understandable. In 2012, Ramadan began on July 20; in 2013, it began on July 9; in 2014, it began on June 29; and in 2015, it began on June 18. https://www.timeanddate.com/holidays.

institution television. The plaintiff asserts that according to the handbook, notices of changes in policy and procedure should be provided on institution television. Dkt. No. 50 at ¶39.

On April 4, 2016, three days before the April 7, 2016 sign-up deadline, the plaintiff was talking with an inmate named Ouati Ali about whether Ali had used the correct form asking to attend the Eid al-Fitr meal. Dkt. No. 33 at ¶¶53-43; Dkt. No. 50 at ¶20. In a lawsuit Ali filed in 2016, the plaintiff submitted a declaration, stating that on April 4, 2016, Ali had showed the plaintiff form correspondence between Ali and Donovan, and that while the form was "dated April 4, 2016," it did not include a response "to Ali's request to be placed on the list for Ramadan." Dkt. No. 42-1 at ¶6.

The plaintiff explains that about a week later, on April 11, 2016, Ali told the plaintiff that Ali's cellmate had received a letter from Donovan confirming that the cellmate's name had been placed on the Ramadan list. Dkt. No. 50 at ¶21. The plaintiff says that Ali "thought it was strange" that although Ali had been in communication with Donovan, Donovan hadn't responded to Ali's request to be added to the list. Id. The plaintiff says this caused him to start "to ask around" about whether anyone else had seen a sign-up deadline. Id. at ¶22. Later that day, another inmate told the plaintiff that Donovan had posted the deadline in the chapel on March 25, 2016, and that the inmate (who worked in the library) would check to see if it had been posted in the library. Id. That same day, the plaintiff sent an information request to Donovan, which stated: "You haven't post[ed] the Ramadan Sign-Up Deadline yet. You just sent a guy confirmation of his placement on the list, what['s] going on, there's no post on Channel 8[;] can we sign up now or what?" Dkt. No. 50-1 at 39.

A few days later, on April 14, 2016, Ali showed the plaintiff Ali's interview/information request to Donovan, in which Donovan indicated that the sign-up deadline was April 7. Dkt. No. 50 at ¶24. The plaintiff sent another interview/information request to Donovan expressing his frustration. Dkt. No. 50 at ¶25. Donovan confirmed that the sign-up deadline was April 7, 2016. Id. Donovan also told the plaintiff and two other inmates that he had been told to post notification only in the chapel and the library. Id. at ¶26. The next day, on April 15, 2016, Haese responded to the plaintiff's letter; she told him about the changes in the posting policy. Id. at ¶28. She also refused to add his name to the list because he had missed the deadline. Id.

A few days after that, on April 19, 2016, the plaintiff sent Eckstein a letter telling him that Donovan and Haese were refusing to add him to the list to receive bagged meals. Id. at ¶29. The plaintiff and two other inmates spoke to Eckstein about this issue a few days later, on April 22, 2016. Id. at ¶30. Eckstein said he would look into it. Id.

On April 24, 2016, the plaintiff filed an inmate complaint stating that he had been unaware of the sign-up deadline and that he wanted to be added to the Ramadan list. Id. at ¶32. The next day, the plaintiff spoke with Haese and informed her that he had filed an inmate complaint; he asked her if he could write to her supervisor. Id. at ¶33. Haese said that her supervisor already knew about her decision to deny his request to be added to the list. Id. She told the plaintiff he could fast on his own. Id.

On May 10, 2016, DeGroot denied the plaintiff's inmate complaint, and the next day, Eckstein denied the plaintiff's request. Id. at ¶¶34-35. The plaintiff appealed DeGroot's denial a few days later; Salinas denied the plaintiff's appeal on July 14, 2016. Id. at ¶38.

The plaintiff explains that he tried to observe the fast by supplementing with food he purchased at the commissary, but due to his lack of funds, he was unable to sustain his fast for the entire month. Id. at ¶40. The plaintiff explains that he missed twelve fast days because he ran out of food. Id. The defendants note that during Ramadan and shortly before it, the plaintiff bought a lot of food at the commissary, which he could have eaten at night after fasting during the day. Dkt. No. 33 at ¶61; Dkt. No. 34-2.

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.    First Amendment Law

Under the "free exercise" clause of First Amendment, individuals have the right to freely exercise their religion. Cutter v. Wilkinson, 544 U.S. 709, 719 (2005). Prison officials are prohibited from "intentionally and substantially" preventing an inmate from practicing his or her religion. Garner v. Muenchow, 715 F. App'x 533, 537 (7th Cir. 2017). "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Kaufman v. McCaughtry, 419 F.3d 678, 682-83 (7th Cir. 2005) (citations omitted).

When evaluating a free-exercise claim, a court first must consider whether an inmate's right to practice his religion was burdened in a significant way. Id. at 683. If so, it then must consider (1) whether the prison's regulation was rationally connected to a legitimate governmental purpose; (2) whether the inmate "had an alternative means to vindicate his free exercise rights;" (3) the effect that accommodating an inmate's rights would have on the guards and other inmates; and (4) whether there are alternatives to the regulation. Tarpley v. Allen Cty., Ind., 312 F.3d 895, 898 (7th Cir. 2002).

The "establishment clause" of the First Amendment "sets forth a principle of government neutrality." Milwaukee Cty. Sheriffs' Ass'n v. Clarke, 588 F.3d 423, 527 (7th Cir. 2009). "It prohibits the government from promoting 'a point of view in religious matters' or otherwise taking sides between 'religion and religion or religion and nonreligion.'" Id. (quoting McCreary Cty. v. ACLU,

545 U.S. 844, 860 (2005)). Under the test articulated by the Supreme Court in
Lemon v. Kurtzman, 403 U.S. 602 (1971), "government action violates the
Establishment Clause if it has any of the following characteristics: (1) a non-
secular purpose; (2) the principal or primary effect of advancing or inhibiting
religion; or (3) fostering and excessive government entanglement with religion."
Id. (citing Lemon, 403 U.S. at 612). See also, Kaufman, 419 F.3d at 684
(citations omitted).

      C.    The Court's Analysis

The plaintiff is proceeding on three claims: 1) that the defendants
violated the First Amendment when they stopped posting religious notices on
institution television, 2) that they violated the First Amendment when they did
not inform inmates that religious notices no longer would be posted on
institution television, and 3) that they violated the First Amendment when they
refused to add the plaintiff to the bagged-meal list even though he explained
that he did not know about the deadline and he had missed the deadline by
only one week.

      1.    *The Decision to Stop Posting Religious Notices on Institution
Television*

The defendants are entitled to summary judgment on the plaintiff's claim
that their decision to stop posting religious accommodation notices on
institution television violated the Free Exercise or Establishment clauses of the
First Amendment, because no reasonable jury could conclude that their
decision substantially burdened the plaintiff's right to practice his religion or
somehow advanced or hindered a religion or created excessive entanglement
with a particular religion.

As to the plaintiff's claim that terminating television notices violated his
right to freely exercise his faith, the plaintiff has not established the first prong

of a free exercise claim: that the termination of television notices substantially burdened the exercise of his faith. The defendants have provided evidence that notice of the bagged meal sign-up deadline was posted in the chapel, the library, the restricted housing unit library and the restricted housing unit carts. Dkt. No. 36-2 at 1. They have provided evidence that the notice would have been posted no later than February 5, 2016[3], two months before the sign-up deadline, and that the posting of the sign-up deadline would have been discussed during weekly services. The plaintiff asserts that his library time was restricted to Monday nights, dkt. no. 50 at ¶19, but even if the plaintiff went to the library only one night a week, that would have given him up to eight opportunities to see the notice in the library alone.[4] If he attended weekly services or study in the chapel, he had similar opportunities to see the notice there.[5]

Notices were not the only way the plaintiff could have found out about the deadline. Donovan was a source of that information. It is true that the Seventh Circuit rejected an argument that an inmate should have anticipated Ramadan in time to contact the chaplain in Conyers v. Abitz, 416 F.3d 580, 585 (7th Cir. 2005)—a case the plaintiff cites. But in Conyers, the plaintiff had

---

[3] While the plaintiff asserts that another inmate told him that that inmate saw Donovan posting the notice in chapel on March 25, 2016, the plaintiff provided no evidence supporting that assertion.

[4] In his amended complaint, the plaintiff says that he told Eckstein inmates could access the library only with a pass, that passes were issued only once a week and that he had "missed weeks of library time by missed placed passes." Dkt. No. 11 at ¶18.

[5] In his amended complaint, the plaintiff says he told Eckstein that he didn't attend services "because of the constant gang activity and arguing of minor things, and that he did not want to be part of any negative spirit." Dkt. No. 11 at ¶18.

not had access to *any* notice of the deadline for signing up for bagged meals, because he was in segregation and the institution did not provide notice to inmates in segregation. <u>Id.</u> at 583. Here, the plaintiff knew there was a deadline for signing up for bagged meals (he'd signed up in every prior year since 2012), and he has provided no evidence that he didn't have access to the library and the chapel, where the notices were posted.

Other inmates also were a source of information about the deadlines. The plaintiff himself has submitted evidence in Ouatri Ali's case indicating that the plaintiff had reason to know on April 4, 2016 that Ali had asked to be added to the Ramadan list, and hadn't received a response. The plaintiff could have asked Ali or Donovan about the deadline at that time—still a few days before the expiration of the deadline.

It appears that the institution television channel was the plaintiff's customary and preferred method of receiving notice of the bagged meal deadline. He cites no authority, and the court cannot find any, for the proposition that the institution must provide notice of the deadline by television. The issue is whether the change in the manner of providing notice—particularly, the termination of one type of notice—substantially burdened the plaintiff's religious exercise. As the defendants note, changing the method of providing notice to inmates about religious accommodations does not affect the accommodation itself. Dkt. No. 32 at 28. Inmates may participate in the accommodation regardless of how they learn about it. The defendants did not prohibit the plaintiff from celebrating Ramadan. They provided notice about how to do so, even if it wasn't the notice the plaintiff was used to. They accommodated inmates who observed the notice and timely asked to be added to the list (like Ali's cellmate).

While it is not the basis for the court's decision, the court notes that there is circumstantial evidence showing that, prior to the deadline, the plaintiff had reason to suspect that the deadline might be looming. The plaintiff had participated in the Ramadan fast in previous years and had added his name to the bagged-meal list in those years. He knew the bagged-meal list existed, and he knew the process for adding his name to the list. He knew that the start date for Ramadan changed each year. The affidavit the plaintiff submitted in Ali's case indicates that he knew as of April 4—three days before the deadline—that Ali had asked to be placed on the list.[6] Yet the plaintiff did not ask Ali about the deadline, or ask Donovan or other prison staff or other inmates.

No reasonable jury could conclude that the termination of the television notices substantially burdened the plaintiff's free exercise of his right to practice his faith. Even if the plaintiff could prove that terminating the television notices constituted a substantial burden, he could not prove the other elements of a free exercise claim. The defendants have provided evidence that the decision to terminate television notices was rationally connected to a legitimate governmental purpose—the effort to provide the same kind of notice to all inmates of all faiths, regardless of whether they had televisions. As the court already has discussed, the plaintiff had alternate means to vindicate his free exercise rights—he had access to the library and the chapel, where notices were posted, and he could have talked to Donovan or to other inmates. Finally,

---

[6] The plaintiff insists that this declaration does not demonstrate that he knew of the sign-up deadline. Dkt. No. 50 at ¶44. He doesn't acknowledge that the language of the declaration—indicating that the document he reviewed with Ali on the fourth of April did not include a response to Ali's request to be placed on the Ramadan list—indicates that at the very least, his conversation with Ali should have prompted him to ask someone about the deadline.

while there was an alternative to terminating the television notices—continuing them—that alternative was not necessary, given that other forms of notice were available to allow the plaintiff and others to vindicate their free exercise rights. The defendants are entitled to summary judgment on the plaintiff's claim that terminating the television notices violated his right to freely exercise his religion.

Nor could any reasonable jury conclude that the defendants' decision to stop broadcasting religious accommodation notices on institutional television violated the Establishment Clause of the First Amendment. The plaintiff has provided no proof that the decision to stop broadcasting the notices via television did not have a secular purpose, and the defendants have identified several secular purposes, *including* a desire to avoid the appearance of favoring one faith over another (a preference the Establishment Clause prohibits), or favoring inmates who had televisions over those who did not. Not broadcasting the notices via television neither advanced nor inhibited religion, nor did it foster excessive entanglement with religion.

The court will grant judgment in favor of the defendants on the plaintiff's first claim.

2.  *The Failure to Notify Inmates that the Institution Would Not Post Religious Notifications on Institution Television*

If no reasonable jury could conclude that the decision to stop posting religious accommodation notices on institution television substantially burdened the plaintiff's ability to practice his religion because that information was available from other sources, it follows that no reasonable jury could conclude that failing to notify the plaintiff of the termination of notice via television substantially burdened his ability to practice his religion. The defendants' failure to notify inmates that the notices would not be broadcast

15

via television did not prevent inmates from seeing the notices in the chapel or the library, hearing the deadline discussed at weekly services, or asking the chaplain or fellow inmates about the deadline.

The plaintiff's argument that the handbook requires staff to post all changes in policy on institutional television does not change the court's analysis. Policy violations, in and of themselves, are not constitutional violations actionable under §1983. See, e.g., Earl v. Karl, 751 Fed. App'x 535, 537 (7th Cir. 2018); Estate of Simpson v. Gorbett, 863 F.3d 740, 746 (7th Cir. 2017).

The defendants are entitled to summary judgment on the plaintiff's claim that their failure to notify him that they would no longer publicize religious accommodations via television violated his constitutional rights.

3.   *The Failure to Add the Plaintiff's Name to the List When He Said He Was Not Aware of the Deadline and Missed It by Only a Few Days*

The plaintiff argues that the defendants' strict adherence to the sign-up deadline and refusal to put his name on the bagged meal list shortly after the deadline expired caused him to miss twelve days of the fast, particularly given his lack of funds to buy meals for himself. Dkt. No. 50 at ¶40. The Seventh Circuit has "repeatedly held that forcing an inmate to choose between daily nutrition and religious practice is a substantial burden." Thompson v. Holm, 809 F.3d 376, 380 (7th Cir. 2016) (citations omitted). A reasonable jury could conclude that the defendants' decision to strictly enforce the sign-up deadline for an inmate who missed that deadline by only a few days and who didn't have the funds to buy thirty days' worth of meals substantially burdened the plaintiff's ability to practice his religion.

Given that, the court must consider (1) whether the defendants' refusal to add the plaintiff's name to the list was rationally connected to a legitimate governmental purpose; (2) whether the plaintiff had a different way of practicing his religion; (3) the effect that accommodating inmates by adding them to the list after the deadline would have on the guards and other inmates; and (4) whether there were alternatives to strict enforcement of the sign-up deadline.

As to the first factor—whether the refusal to add the plaintiff to the list was rationally related to a legitimate governmental purpose—the evidence shows that DOC institutions impose a sign-up deadline to allow food services sufficient time to plan different menus, fine-tune food selections, place vendors on notice so they can acquire stock, and adequately prepare the meals. The defendants explain that the DOC food budget is tight, so they do not have the luxury of ordering extra food. Conversely, they cannot run the risk of having inadequate amounts of food because it could create a security risk if inmates are served different food items. Presented with this explanation, other judges have concluded that the sign-up deadline is rationally related to a legitimate government purpose. See, e.g., Dangerfield v. Ewing, No. 18-cv-737, 2020 WL 94758, at *5 (W.D. Wis. Jan. 8, 2020); Ajala v. West, No. 13-CV-184, 2014 WL 6893722, at *1-2 (W.D. Wis. Dec. 5, 2014). This court agrees.

The plaintiff doesn't challenge the validity of or the justification for the sixty-day deadline, though. He challenges the defendant's refusal to add his name to the list when he asked them to do so. The sign-up deadline was April 7, 2016. The plaintiff asked to be added to the list on April 11, 2016—only four days later. The plaintiff asserts that the staff—Donovan, in particular—had made exceptions to the policy before. He implies that if he'd been added to the

list on April 11, when he first asked, the staff would have known about his request well in advance of Ramadan. He contends that all the institution needed to do was to save his regular food tray for after sundown. The defendants themselves concede that there was an exception to the sixty-day requirement for inmates who transferred into the institution less than sixty days before Ramadan or during Ramadan, assuming they'd been signed up for bagged meals at their prior institution.

The defendants respond that it isn't as simple as saving a regular meal tray. They explain:

> [Saving a tray] would not be feasible due to the timing of Ramadan, the number of inmates participating, staffing in the middle of the night, and the physical makeup of the prison. The prison lacks the proper amount of cooler space to hold the trays for the 6 to 18 hours which would be needed. The prison also has no way to reheat the trays in the middle of the night to account for food safety concerns. (Supp. Decl. Books ¶¶ 4-6.) Given these logistics, the only way to provide meals for Ramadan at GBCI is to provide meals which can be stored efficiently in a cooler on each unit and served cold without needing to be reheated. This procedure requires advanced notice so that Food Services can order the right amount of food to use in the meal bags. (DPFOF ¶¶ 62-78).

Dkt. No. 51 at 5.

The defendants have demonstrated that their practice of strictly adhering to the sixty-day rule relates to a legitimate government purpose. The institution plans precisely for Ramadan, and orders carefully to ensure that it has the necessary food that can be stored in the appropriate way. It builds in a slight contingency for the small number of Muslim inmates who may transfer into the facility in the sixty-day period before and during Ramadan. But if it were to make an exception for inmates who didn't pay attention to the posted notices and didn't meet the sign-up deadline, the exception could swallow the rule. The plaintiff's implication that he's just one inmate, and that it isn't that big a deal,

is belied by his own assertions that other inmates failed to sign up by the sixty-day deadline. Even if the institution had one extra bagged meal on hand, or two, it has presented evidence that it doesn't have five, or ten, or fifteen, and that it can't afford to have that many. Where would it draw the line on late sign-ups? Would the institution allow an inmate who missed the deadline by two days to sign up, but refuse an inmate who missed it by four days? The deadline would be of little use if it were not . . . well, a deadline.

The plaintiff asserts that the defendants throw away food. If true, that fact does not show that the defendants could just save that food and use it for Muslim inmates who failed to meet the bagged meal sign-up deadline. Some of the food may not keep without refrigeration and might not be safe for an inmate to eat if given to the inmate after sundown for eating before sunrise. Some of the food may be contaminated. Some of it may not be Halal or may not be suitable for Muslim inmates with food allergies. Budget and food safety constitute legitimate government purposes.

As to whether the plaintiff had another way of exercising his rights, the defendants assert that the plaintiff was free to observe the fast by purchasing food from the commissary, including meats, beans, tortillas, rice, nuts, etc. Dkt. No. 33 at ¶¶59-60. This argument is not persuasive. The fact that food is available for purchase does not mean that a prisoner has the resources to purchase it; the plaintiff asserts that he was *not* able to purchase enough food to allow him to maintain his fast for the entire month. Dkt. No. 50 at ¶¶40-41. This factor would weigh in favor of the plaintiff's free exercise argument.

Third, the court considers the effect that accommodating the plaintiff's request to be added to the bagged-meal list after the deadline would have on guards and other inmates. This factor weighs in favor of the defendants. As

they explain, making an exception to the deadline for an inmate who asserts that he didn't know about the deadline (and, in this case, argues that he didn't know about it because he expected a certain type of notice) would render the deadline meaningless. It also would thwart the institution's ability to precisely plan the amount of food needed. According to the defendants, there are rarely extra Ramadan meals available on any given day, so kitchen staff would have to use food designated for other purposes, which would lead to food shortages elsewhere. Again, although the plaintiff asserts that when he worked in the kitchen, staff would frequently throw away food that was not eaten by the inmates, dkt. no. 50 at ¶54, serving leftovers from other meals could carry health risks, and the plaintiff's assertion does not address the defendants' explanation that serving different meals to different inmates could create security risks.

Finally, the plaintiff has not suggested, or provided evidence of, any reasonable alternative to excluding inmates who do not timely sign up for bagged meals.

The weight of the evidence indicates that no reasonable jury could find that the defendants' failure to add the plaintiff's name to the list after the deadline violated his free exercise rights. Even if there were a genuine dispute as to an issue of material fact on this question, however, the court still would be required to grant judgment in favor of the defendants, because they are entitled to qualified immunity.

### 4.       *The Defendants are Entitled to Qualified Immunity*

The defendants argue that even if they did violate the plaintiff's First Amendment rights, they are entitled to qualified immunity. Dkt. No. 32 at 22-26. The plaintiff responds that the defendants are not entitled to qualified

immunity for all the reasons he provided in support of his claims. Dkt. No. 48 at 14-15.

> A public official defendant is entitled to qualified immunity unless two disqualifying criteria are met. First, the evidence construed in the light most favorable to the plaintiff must support a finding that the defendant violated the plaintiff's constitutional right. Second, that right must have been clearly established at the time of the violation. *Stainback v. Dixon*, 569 F.3d 767, 770 (7th Cir. 2009). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 . . . (2009). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood *what he is doing* violations that right.'" *Mullenix [v. Luna, ___ U.S. ___, 136 S. Ct. 305, 308 . . . (2015)]* (emphasis added).

Day v. Wooten, 947 F.3d 453, 460 (7th Cir. 2020).

The defendants all are public officials. The court already has concluded that the evidence does not support a finding that stopping the televised notices of religious accommodations, failing to notify inmates that they were terminating the televised notices and not adding the plaintiff to the Ramadan bagged meals list violated the plaintiff's First Amendment rights. Nor did the plaintiff have a "clearly established" right to receive television notices, to receive notice of the termination of such notices or to have his name added to the Ramadan list at the time of the alleged violations.

In Riley v. Ewing, 777 F. App'x 159, 161 (7th Cir. 2019), the plaintiff challenged the district court's conclusion that in denying him bagged meals, the institution chaplain had not violated a clearly established right. The plaintiff argued that in its decision in Conyers, the Seventh Circuit "clearly established that inmates who did not receive notice of the sign-up deadline for Ramadan meals and submitted an untimely request are nevertheless entitled to

the special religious diet." <u>Riley</u>, 777 F. App'x at 161. The Seventh Circuit

rejected the plaintiff's argument, holding that

> *Conyers* does not clearly establish that [the chaplain] violated [the plaintiff's] free-exercise rights. Unlike the plaintiff in *Conyers*, [the plaintiff] knew that there was a deadline to sign up for Ramadan meals. . . . He could have asked about the deadline earlier, and *Conyers* does not establish that the chaplain was obligated to notify him when Ramadan was approaching. And unlike the defendants in *Conyers,* [the chaplain] presented evidence that the logistical challenges associated with ordering, receiving, and preparing enough Ramadan meals justified limiting the exceptions to those who entered the prison after the sign-up deadline. Moreover, *Conyers* does not suggest that [the chaplain] would be liable for declining to accommodate [the plaintiff] after he failed to adhere to the sign-up policy.

<u>Id.</u> at 161-162.

So the defendants had no reason to be aware of a clearly-established right for inmates who claimed to be unaware of the deadline for signing up but missed it to nonetheless receive bagged meals, because there is no such clearly-established right. Nor has the court identified any authority clearly establishing a right for an inmate to receive notice of the sign-up deadline in a particular way, or any authority clearly establishing a right for an inmate to be notified if the institution decides to change the method of notice.

Because the court finds that there is no established law that would have enabled the defendants to conclude that their actions were violating the plaintiff's First Amendment rights, they are entitled to qualified immunity.

### 5. *Other Issues*

There are other reasons for the court to grant judgment in favor of specific defendants, or on specific allegations.

In its order screening the second amended complaint, the court did not allow the plaintiff to proceed on a free-exercise claim against Donovan, because

he did not allege sufficient facts to show that Donovan had the authority to add the plaintiff to bagged meal list or to require anyone else to do so. Dkt. No. 17 at 8.

To prove a defendant liable under §1983, the plaintiff must prove that the individual was personally involved in the constitutional violation the plaintiff claims to have suffered. Colbert v. City of Chi., 851 F.3d 649, 657 (7th Cir. 2017). Neither Donovan, Salinas nor DeGroot played any role in deciding to terminate the television notices, and the plaintiff presented no evidence regarding who was responsible for deciding whether to notify inmates about the termination of the television notices.[7] There is no evidence that West, Salinas or DeGroot played any role in refusing to put the plaintiff on the bagged meals list.

The plaintiff filed a grievance about the fact that he wasn't being allowed to participate in the Ramadan fast, which complaint examiner DeGroot reviewed; the plaintiff says that DeGroot responded to him by reviewing his grievance, explaining why the plaintiff wasn't being allowed bagged meals and dismissing the grievance. Dkt. No. 11 at ¶19. The plaintiff appealed; Salinas reviewed the appeal, explained why the plaintiff was not being allowed bagged meals and recommended that the appeal be dismissed. Id. at ¶21.

The plaintiff did not allege that the two complaint examiners ignored his grievances. Rather, he alleges that they "responded differently than he wished." Smego v. Hankins, 681 F. App'x 506, 508 (7th Cir. 2017). The plaintiff has not accused these defendants of "refusing to do [their] job[s] and of leaving the prisoners to face risks that could be averted by faithful implementation of the

---

[7] In the amended complaint, the plaintiff indicated that Donovan told him that he had been directed "by management" to post the notice of the sign-up deadline only in the chapel and the library. Dkt. No. 11 at ¶13.

grievance machinery. He contends, instead, that [the examiners] should be held liable because [they] carried out [their] job[s] exactly as [they] were supposed to do." Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009). A complaint examiner is not liable under §1983 simply for denying an inmate's grievance, or for declining to agree with an inmate.

The second amended complaint did not allege that the defendants violated the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§2000cc, *et seq.* Dkt. No. 11. In his brief opposing summary judgment, the plaintiff stated, for the first time, that the defendants violated his rights under "RLUIPA." Dkt. No. 48 at 9. Because the plaintiff did not raise an RLUIPA claim in his second amended complaint, he cannot raise such a claim for the first time in responding to a summary judgment motion. Nor did he cite any case law analyzing RLUIPA or make any arguments about why he believed the plaintiff's violated it.

The court allowed the plaintiff to proceed on failure-to-intervene claims against Eckstein, West, DeGroot and Salinas, because he alleged in his complaint that all of them knew Haese had refused to add him to the sign-up list and did nothing. Dkt. No. 17 at 7-8. The court has concluded that neither Haese nor the other defendants violated the plaintiff's rights by refusing to add him to the list, and that they are entitled to qualified immunity. The court also notes, however, that the plaintiff has presented no evidence that DeGroot or Salinas, as complaint examiners, had the authority to add him to the bagged lunch list.

## III.   CONCLUSION

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 31.

The court **DISMISSES** the case and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 11th day of February, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**